**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| JEFFREY ECKRICH, ET AL., | * | |
| Plaintiffs, | * | |
| v. | * | Civil No. 25-2671-BAH |
| STATE OF MARYLAND, ET AL., | * | |
| Defendants. | * | |

* * * * * * * * * * * * * *

**MEMORANDUM OPINION**

Plaintiffs Jeffrey Eckrich, Barbara Utz, Lilian Lone, Dalton Decripino, Sef Martinez, John Jones, III, William Paskey, II, and Andrew Turner (collectively, "Plaintiffs") brought suit against the State of Maryland and two groups of defendants: the Town of Ridgely, Maryland, John Hurley, John Buckle, Anthony Casey, David Crist, Stephanie Berkey, Melissa Leonard, and James Joles (collectively, "Town Defendants"), and Donald Baker, Jr., and Rodney Helmer (collectively, "Sheriff Defendants"). ECF 1. Plaintiffs bring procedural due process, substantive due process, and "defamation plus/stigma plus" claims under the United States and Maryland state constitutions, civil conspiracy claims under federal and Maryland law, defamation, tortious interference, and wrongful discharge claims under Maryland law, a *Monell*[1] claim, and a claim for declaratory judgment and mandamus relief. ECF 1.

Pending before the Court are Town Defendants' motion to dismiss, ECF 6, and Sheriff Defendants' motion to dismiss, ECF 16. Plaintiffs filed an opposition to each motion to dismiss, ECF 19; ECF 20, and both Town Defendants and Sheriff Defendants filed replies, ECF 27; ECF

[1] *Monell v. Dept. of Social Srvs.*, 436 U.S. 658, 690 (1978).

28. All filings include memoranda of law.[2] The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). Accordingly, for the reasons stated below, the Town Defendants' motion to dismiss, ECF 6, is **GRANTED** as to all federal claims, and Sheriff Defendants' motion to dismiss, ECF 16, is **GRANTED** as to all federal claims. Because the Court declines to exercise supplemental jurisdiction over the state law claims, they will be dismissed without prejudice.

## I. BACKGROUND

### A. Factual Allegations[3]

Plaintiffs are eight former employees of the former Town of Ridgely Police Department (RPD) in Caroline County, Maryland. ECF 1, at 2–3 ¶¶ 2–4. Lead plaintiff Jeffrey Eckrich was the RPD Chief of Police at all relevant times during the events in the complaint. *Id.* ¶ 2. There are two groups of defendants. The Town Defendants include the town of Ridgely, Maryland, ("Ridgely"), three Ridgely commissioners—John Hurley, John Buckle, and Anthony Casey—Ridgely director of operations David Crist, Ridgely clerk-treasurer Stephanie Berkey, Ridgely treasurer Melissa Leonard, and former RPD officer James Joles. *Id.* at 3–4 ¶¶ 5–6, ¶¶ 9–13. The Sheriff Defendants include Caroline County sheriff Donald Baker, Jr., and Caroline County deputy sheriff Rodney Helmer. *Id.* at 3 ¶¶ 7–8. For ease of reference, the following table identifies each defendant.

| Defendant | Position |
|---|---|
| Donald Baker, Jr. | Caroline County Sheriff |

[2] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

[3] The facts provided in this section are taken from the complaint and attached exhibits and are assumed true for the purposes of the pending motion to dismiss. *See Kan. City Live Block 124 Retail, LLC v. Kobe Kan., LLC*, Civ. No. GLR-14-3236, 2015 WL 6151266, at *1 n.1 (D. Md. Oct. 16, 2015) (citing *Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)).

| | |
|---|---|
| Rodney Helmer | Caroline County Deputy Sheriff |
| John Hurley | Town of Ridgely Commissioner |
| John Buckle | Town of Ridgely Commissioner |
| Anthony Casey | Town of Ridgely Commissioner |
| David Crist | Town of Ridgely Director of Operations |
| Stephanie Berkey | Town of Ridgely Clerk-Treasurer |
| Melissa Leonard | Town of Ridgely Treasurer |
| James Joles | Former RPD Officer |

*i. Eckrich's Employment Contract*

Plaintiff Jeffrey Eckrich was promoted from the position of lieutenant to the position of Chief of Police of the RPD effective January 1, 2021. *Id.* at 2 ¶ 2; ECF 1-1, at 3. His employment contract provides that "Eckrich shall be employed for an indefinite period of time, commencing with the execution of this agreement, January 1, 2021, with no renewal of said agreement necessary unless both parties agree to the terms of a new employment agreement." ECF 1-1, at 1. The contract further states that "Eckrich is not an 'at-will' employee." *Id.* at 3. However, the contract provides that Eckrich may be unilaterally terminated by the Town, without a finding of cause, provided that the Town gives 90 days' notice of its intent to terminate the contract without cause, provides three months' severance, and pays the balance of unused vacation leave and accrued sick leave. *Id.* at 3–4. The contract also provides that Eckrich may be terminated for cause upon a breach of the employment agreement or repeated neglect to perform required duties that continues after written notice and a 30-day cure period, a felony conviction or criminal act related to employment with the town, non-criminal conduct that violates the town's personnel manual or other reasonable standards of professional and personal conduct, or mental or physical unfitness that prevents him from carrying out his essential duties. *Id.* at 4. The contract requires that any discharge for cause be upon proper written notice and pursuant to a hearing at which Eckrich has the right to be represented by counsel. *Id.* The contract also allows the town to terminate the

contract at any time for the reasons set forth in paragraph 7.4 of chapter 7 of the Town personnel manual. *Id.*

*ii. Joles' Hiring and Firing*

Defendant James Joles was hired by the Milford Police Department ("MPD") in Delaware on August 1, 2017. ECF 1, at 5 ¶ 17. On October 12, 2018, Joles was fired for poor performances and repeated lapses of judgment and was placed on the Delaware Department of Justice's *Brady* list.[4] *Id.* at 5 ¶ 18, 21. In February 2023, Joles applied for a job at RPD, but did not disclose at any point that he had been placed on Delaware's *Brady* list. *Id.* at 6 ¶¶ 24–25. Then-police chief Eckrich hired Joles without knowing that he was on Delaware's *Brady* list, and Joles began the role in May 2024. *Id.* ¶ 26. In January 2024, the Ridgely town commissioners voted to terminate Joles' employment with the RPD, and Joles resigned on January 17, 2024, in lieu of termination. *Id.* ¶ 27. Joles then applied to the Greensboro Police Department in Maryland, but his application was denied when the department discovered that Joles was on Delaware's *Brady* list. *Id.* ¶ 28. Joles then sent the Greensboro Police Department's chief of police Lenox S. Trams the following message:

> The town was already aware of the Brady stuff along with you. We discussed it in the interview. I'm hoping that you defended me to the town about Ridgely? If not I understand, I will tell you tho [sic], I kind of feel like you have scrutinized every single thing in my life, which is fine, but definitely not a good feeling. I have told you things in confidence that I have not told anyone else and I have been up front about everything. Chief you and I both know this is not right what is happening to me. But if you don't wanna hire me or the town doesn't, I understand. But I'm going after Chief Eckrich and Ridgely. Your [sic] not going to destroy my life and just walk away from it.

---

[4] A *Brady* list "provide[s] notice to prosecutors of law enforcement officers who are credibility risks and who may hinder the integrity of a prosecution." *Snyder v. Va. State Police,* Civ. No. No. 3:24-CV-652 (RCY), 2025 WL 2676574, at *3 (E.D. Va. Sep. 18, 2025); *see also Brady v. Maryland*, 373 U.S. 83 (1963).

*Id.* ¶ 29. Joles then contacted defendant Donald Baker, Jr. ("Baker"), the Caroline County sheriff, and Plaintiffs allege that the two "devised a plan that would eliminate the RPD and allow the Sheriff's Office to assume responsibility for law enforcement in the Town of Ridgely." *Id.* at 7 ¶¶ 31–32.

*iii. The Plan*

As part of the alleged plan, Joles made several false allegations against then-RPD police chief Eckrich, including the allegation that Chief Eckrich knowingly did not disclose that Joles was on the Delaware *Brady* list when hiring Joles, sold a town police car for less than market value without permission, submitted false payroll records, was under the influence of medications while on duty, and committed other mismanagement. *Id.* ¶ 32. Sheriff Baker then reported those false allegations to Caroline County State Attorney Sloan Franklin, who referred the allegations to the Maryland Office of the State Prosecutor ("OSP"). *Id.* ¶ 33. On February 23, 2024, OSP opened an investigation into Chief Eckrich. *Id.* at 8 ¶ 34.

On March 11, 2024, Sheriff Baker and attorney Sloan Franklin met with Ridgely's town commissioners Hurley and Buckle, operations director Crist, treasurer Leonard, clerk-treasurer Berkey, and Deputy Helmer in a closed meeting, where Sheriff Baker allegedly repeated the false allegations made by Joles and informed the group that RPD was under investigation by OSP for criminal wrongdoing. *Id.* ¶ 35. Later that night, another closed meeting was held with Hurley, Buckle, Crist, Leonard, Berkey, town attorney Patrick Thomas, Franklin, and Joles. *Id.* ¶ 36.

The next day, May 12, 2024, the "[Caroline County] Sheriff's Office applied for and obtained a search warrant to search the premises of the RPD building for evidence of theft, forgery of documents, and misconduct in office." *Id.* ¶ 37. Plaintiffs allege that the warrant application did not disclose that Joles was the source of information, failed to accurately describe the vehicle

sold by Eckrich, which had been in an accident and had high mileage, and included other misrepresentations. *Id.*

*iv. The Suspensions and New Law Enforcement Agreement*

Before the sheriff's office actually obtained the search warrant, defendants Baker, Helmer, Hurley, and Buckle arrived at the RPD and informed Eckrich that "per the direction of the OSP's office, Eckrich and all employees at the RPD were to be suspended without pay pending completion of the OSP's investigation." *Id.* at 8 ¶ 38. Commissioner Hurley stated that Baker and Helmer had informed him and Buckle that OSP had directed RPD's suspension without pay, but that the commissioners agreed to suspend the RPD employees with pay. *Id.* Baker demanded that all the suspended employees turn in their firearms, badges, credentials, and training certifications. *Id.* at 9 ¶ 39. None of the employees were given any justification for their suspension. *Id.*

On March 13, 2024, Ridgely's commissioners issued a press release sharing that they had suspended the RPD employees with pay pending the OSP investigation and that the commissioners were developing a temporary agreement with the Caroline County Sheriff's Office for public safety services. *Id.*; ECF 1-2. News of the suspensions and investigation spread quickly and was reported on local and national news broadcasts and in written news media. ECF 1, at 9 ¶ 40.

On March 20, 2024, the commission signed a law enforcement services agreement with Sheriff Baker to commence on April 1, 2024. *Id.* at 10 ¶ 41; ECF 1-3. The agreement stated that services under the agreement would "continue on an indefinite term until terminated." ECF 1-3, at 1.

*v. False Statements Regarding RPD and the OSP Investigation*

On April 1, 2024, a town meeting was hosted to discuss the agreement with the Caroline County Sheriff's Office, at which Sheriff Baker made two allegedly false statements. ECF 1, at

10 ¶ 42. First, he stated that "the Office of the State Prosecutor is the one investigating these incidents and these allegations, and I'm not even sure quite frankly the totality of the circumstances of what they're investigating." *Id.* Second, he said "we are not investigating, the Office of the State Prosecutor is investigating, so what that whole circumstance is or why they are investigating I will not even speculate." *Id.* Plaintiffs allege these statements were false because the sheriff's department had "just two weeks earlier obtained and executed a search warrant alleging specific crimes for which the premises were expected to contain evidence and had been the driving force behind the suspensions." *Id.* At the town meeting, Hurley also stated that the commissioners did not vote to suspend the entire RPD but rather were informed by the OSP that the officers were suspended. *Id.* ¶ 43. Plaintiffs allege that this too was false, because Baker had instigated the suspension of the entire RPD. *Id.*

On April 4, 2024, Sheriff Baker sent an email to treasurer Berkey, operations director Crist, and Deputy Helmer with an estimated yearly cost for the sheriff's office to replace the RPD, despite the April 1, 2024, agreement being temporary pending the OSP investigation. *Id.* ¶ 44; ECF 1-4.

On April 10, 2024, a closed commission meeting concerning the sheriff's proposal to permanently replace the RPD with the sheriff's office was held with Hurley, Buckle, Casey, Crist, Berkey, Leonard, and town attorney Patrick Thomas. ECF 1, at 11 ¶ 45. At that meeting, participants discussed the employment status of RPD employees and decided that the employees would be terminated on July 1, 2024. *Id.* ¶ 47. The meeting minutes included a proposed amendment to the April 1, 2024, agreement with the sheriff's office. *Id.; see also* ECF 1-6 (meeting minutes for April 10, 2024, meeting).

On May 1, 2024, the RPD employees received termination letters, effective July 1, 2024. *Id.* ¶ 46. The letter's only reason for termination was that "the Town's law enforcement services are being provided by the Sheriff." *Id.*; *see also* ECF 1-5 (termination letters to each RPD employee).

On May 6, 2024, at a town commission meeting, Sheriff Baker made the allegedly false statement that "we were told by the [OSP] to suspend." ECF 1, at 10 ¶ 48. When a citizen asked which commissioners "gave the order to suspend," commissioner Casey replied that he was not present and commissioners Hurley and Buckle said that they could not recall. *Id.* Later that day, the commission issued a press release announcing an agreement to have the Caroline County Sheriff's Office replace the RPD. *Id.; see also* ECF 1-7. The release also stated that the commissioners had taken "immediate action by suspending the [RPD] pending an investigation by the [OSP]" and emphasized the town's "commitment to ongoing vigilance and responsiveness to the community's needs, while also delivering overall annual cost savings to the Town of Ridgely." ECF 1-7.

*vi. The OSP Investigation Report*

On July 25, 2024, OSP completed its investigation and allegedly "cleared Jeffrey Eckrich and the entire RPD of any wrongdoing," finding the allegations to be unsubstantiated. ECF 1, at 10 ¶ 50. The RPD employees were never informed of the allegations against them or permitted to challenge them. *Id.* The partially redacted OSP report stated the following: OSP initiated the investigation pursuant to a referral from Caroline County State Attorney Sloane Franklin, which alleged that Eckrich had knowingly withheld a disclosure related to the hiring of Joles, improperly sold town-owned property, and committed other potential improprieties. ECF 1-8, at 2. OSP initiated the investigation related to the suspected violations of perjury and misconduct in office.

*Id.* On March 11, 2024, a former RPD employee whose name is redacted appeared before the commissioners and presented information and a document alleging misconduct by Eckrich and other RPD employees. *Id.* at 3. The next day, the reporting agent learned that a new paper shredder had recently been delivered to RPD's office. *Id.* The same day, the Caroline County Sheriff's Office obtained and executed a search warrant for the RPD office pertaining to the alleged misconduct and the commissioners suspended all RPD officers—without guidance from OSP. *Id.* The report details the remainder of the investigation, including interviews with various RPD and town employees, concludes that the "investigative findings did not disclose or surface sufficient evidence of criminal activity warranting further investigation or prosecution," and closes the investigation. *Id.* at 7.

On September 9, 2024, the commissioners issued a statement regarding the OSP investigation. *See* ECF 1-9. The statement described the OSP investigation, shared the redacted OSP report, detailed the sheriff's search of the RPD office, and explained the agreement with the sheriff's office for law enforcement services. *Id.* at 1. The commission stated that the OSP investigation was "not initiated by, or with the knowledge of" the Ridgely commissioners or town staff. *Id.* The statement also noted that reestablishing the RPD would be complex and expensive, that "most of the former RPD employees have secured employment elsewhere . . . [and] would be unlikely to return to their former positions even if those positions were available," and that the commissioners believed "it is in the best interest of the Town to continue the present arrangement with the Sheriff and the County through at least FY25 and to reevaluate the Sheriff's engagement when preparing the FY26 budget." *Id.* at 2.

As of the filing of the complaint, the Caroline County Sheriff's Office was still providing law enforcement services to Ridgely. ECF 1, at 12 ¶ 53.

### B. Procedural History

Plaintiffs filed suit against all Defendants on August 13, 2025, alleging federal question jurisdiction and seeking damages, declaratory judgment, and mandamus relief. ECF 1. Town Defendants filed a motion to dismiss on October 10, 2025, ECF 6, and Sheriff Defendants filed a motion to dismiss on November 7, 2025, ECF 16. Plaintiffs responded in opposition to both motions on November 24, 2025. ECF 19; ECF 20. Town Defendants replied on December 12, 2025, ECF 27, and Sheriff Defendants replied on December 15, 2025, ECF 28. Separately, the State of Maryland filed a motion to dismiss on November 4, 2025, ECF 15, which Plaintiffs did not oppose, ECF 21, and the Court granted on December 2, 2025, ECF 24. Currently, both remaining groups of Defendants' motions to dismiss are pending before the Court. Given the overlapping nature of the Town Defendants' and Sheriff Defendants' motions to dismiss, the Court addresses both motions below as they relate to Plaintiffs' federal claims.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) governs dismissals for failure to "state a claim upon which relief can be granted." In considering a motion under this rule, courts discount legal conclusions stated in the complaint and "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court then draws all reasonable inferences in favor of the plaintiff and considers whether the complaint states a plausible claim for relief on its face. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

"The complaint must offer 'more than labels and conclusions' or 'a formulaic recitation of the elements of a cause of action[.]'" *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 747 (4th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). At the same time, a "complaint will not be dismissed as long as [it] provides sufficient detail about [the plaintiff's] claim to show that [the plaintiff] has a more-than-conceivable chance of success on the merits." *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 396 (4th Cir. 2014).

The Court may consider "documents attached to the complaint, 'as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic.'" *Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019) (quoting *Philips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)). A document is "integral" when "its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation and emphasis omitted).

## III. ANALYSIS

The complaint contains thirteen counts. Counts 1–IX and XIII do not specify against which defendants the counts are brought, while Count X is brought against Joles, Baker, Helmer, Hurley, Buckle, and Casey, Count XI is brought against Hurley, Buckle, and Casey, and Count XII is brought against the Town of Ridgely. ECF 1, at 13–29. The following table summarizes each count for reference.

| Count | Description | Defendants |
|---|---|---|
| I | Procedural Due Process – 14th Amendment (42 U.S.C. § 1983) | Unspecified |
| II | Substantive Due Process – 14th Amendment (42 U.S.C. § 1983) | Unspecified |
| III | Defamation Plus/Stigma Plus – 14th Amendment (42 U.S.C. § 1983) | Unspecified |

| | | |
|---|---|---|
| IV | Civil Conspiracy (42 U.S.C. § 1983) | Unspecified |
| V | Procedural Due Process (Md. Decl. of Rights, Art. 24) | Unspecified |
| VI | Substantive Due Process (Md. Decl. of Rights, Art. 24) | Unspecified |
| VII | Defamation Plus/Stigma Plus (Md. Decl. of Rights, Art. 24) | Unspecified |
| VIII | Civil Conspiracy (Md. Common Law) | Unspecified |
| IX | Defamation *per se* (Md. Common Law) | Unspecified |
| X | Tortious Interference with Contractual Relations/Prospective Economic Advantage (Md. Common Law) | Joles, Baker, Helmer, Hurley, Buckle, and Casey |
| XI | Wrongful Discharge (Local Gov't Code § 5-206(d)) | Hurley, Buckle, Casey (town commissioners) |
| XII | *Monell* Claim | Town of Ridgely |
| XIII | Declaratory Judgment/Mandamus (Md. Code Ann., Courts & Jud. Proc. Code § 3-8B-01 et seq) | Unspecified |

## A. Fourteenth Amendment Claims[5]

### 1. Procedural Due Process (Count I)

In Count I, Plaintiff bring a procedural due process claim under the Fourteenth Amendment to the U.S. Constitution. ECF 1, at 13. "Procedural due process applies only to the deprivation of

[5] "Article 24 is Maryland's constitutional analog to the Due Process Clause of the Fourteenth Amendment, and ordinarily is interpreted *in pari materia* with its federal counterpart." *Murphy-Taylor v. Hofmann*, 968 F. Supp. 2d 693, 728 (D. Md. 2013) (citing *Doe v. Dept. of Pub. Safety & Corr. Servs.*, 971 A.2d 975, 982 (Md. App. 2009)). Even so, the Maryland Supreme Court has noted that Article 24 may still be interpreted differently than the Fourteenth Amendment in some circumstances. *Dua v. Comcast Cable of Md., Inc.*, 805 A.2d 1061, 1071 (Md. 2002). However, the parties do not appear to dispute that they may be interpreted co-extensively in this case. *See* ECF 6, at 15; ECF 16-1, at 10; ECF 20, at 16 (motions and responses considering federal and state procedural due process claims together). Regardless, since the Court ultimately dismisses all federal claims, it declines to exercise supplemental jurisdiction over all state law claims, even those that might be analyzed identically to their federal analogs. As such, the following process analysis applies only to Counts I, II, and III.

liberty and property interests that the Fourteenth Amendment encompasses." *Rockville Cars, LLC v. City of Rockville, Md.*, 891 F.3d 141, 145 (4th Cir. 2018) (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 569 (1972)). To establish a procedural due process claim, a plaintiff must show (1) that they had a protected liberty or property interest; (2) of which the defendant deprived them; and (3) without due process of law. *Id.* (citing *Tri City Paving, Inc. v. Ashe City*, 281 F.3d 430, 436 (4th Cir. 2002)).

*i. Protected Property Interest*

"Whether a public employee has 'a property interest in his employment is determined by reference to state law.'" *Murphy-Taylor v. Hofmann*, 968 F. Supp. 2d 693, 730 (D. Md. 2013) (citing *Carroll v. City Of Westminster*, 52 F. Supp. 2d 546, 561 (D. Md. 1999), *aff'd*, 233 F.3d 208 (4th Cir. 2002)). "As a general rule, a non-tenured State or local government employee who serves 'at will' is *not* regarded as having a property right in continued public employment," including police officers. *Elliott v. Kupferman*, 473 A.2d 960, 966 (Md. App. 1984) (emphasis in original). "Absent some special tenure provision, a police officer does not have a federally protected right to continued employment as a police officer." *Id.* (citations omitted). However, a property interest in employment that must be "protected from deprivation without due process[] 'can, of course, be created by ordinance, or by an implied contract,' and '[w]hether such a guarantee has been given can be determined only by an examination of the particular statute or ordinance in question.'" *Murphy-Taylor*, 968 F. Supp. 2d at 730 (citing *Bishop v. Wood*, 426 U.S. 341, 34–45 (1976) (second bracket in original)).

Plaintiffs argue that they possess a property interest in their continued employment with the Ridgely Police Department because "applicable state-law authorities provide they may be removed from their employment only for cause." ECF 1, at 13 ¶ 55. Specifically, Plaintiffs

identify two sources of law that purportedly "operate to establish the existence and scope of the claimed property interest." ECF 20, at 20. First, Maryland Local Government Code § 5-206(d) ("§ 5-206") provides that a municipality may remove or temporarily suspend an appointed municipal officer for inefficiency, malfeasance, misfeasance, nonfeasance, misconduct in office, or insubordination, but that a municipality must notify the officer and conduct a hearing before removing or suspending the officer. *See also* ECF 1, at 13 ¶ 56. Second, § 27 of the Town Charter ("§ 27") provides that the commissioners may remove an officer for a finding of "misconduct unbecoming an officer, willful disobedience, neglect of duty, misfeasance or malfeasance in office." *Id.* at 14 ¶ 58. The commission may only remove officers for such a finding "upon complaint in writing, filed with the Commissioners of Ridgely, after notice to the party complained of informing him of what he is charged and to appear and defend himself first having been given him in writing at least five days before the time appointed for the hearing." *Id.*

In contrast, Town Defendants argue that Plaintiffs have alleged no statute or ordinance conferring tenure on RPD employees nor restricting the commissioners' ability to eliminate the police department. ECF 6-1, at 16. Town Defendants do not necessarily dispute that § 5-206 and § 27 create some property interest. *See* ECF 27, at 4 (acknowledging § 5-206 governs "the for-cause suspension or removal of 'any officer'" and § 27 governs individualized disciplinary removals pursuant to written complaint, notice and hearing). Town Defendants assert, however, that the complaint does not allege facts that would place Plaintiffs under the protection of either § 5-206 or § 27. ECF 6-1, at 16–17. Specifically, they contend that the suspensions were "not based on findings of individual misconduct and [do] not fall within § 27 or § 5-206," and that the terminations resulted from the "municipality's decision to eliminate all positions in a department for structural and budgetary reasons." ECF 27, at 4–5. Town Defendants also highlight Ridgely's

FY 2025 budgeting process, through which "the Commissioners made the interim Sheriff's arrangement permanent and laid off the RPD as a unit." *Id.*

The plain language of § 5-206 does not require, as Town Defendants argue, ECF 27, at 4, a formal individual *finding* of misconduct in order to trigger § 5-206's protections. Instead, it simply requires notice and a hearing when "a municipality . . . provide[s] for the removal or temporary suspension of an appointed municipal officer for: (i) inefficiency; (ii) malfeasance; (iii) misfeasance; (iv) nonfeasance; (v) misconduct in office; or (vi) insubordination." In *Bowers v. Town of Smithsburg*, the district court analyzed the predecessor statute to § 5-206, Md. Code. Art. 23A § 2(b)(25) ("§ 2(b)(25)"), which authorized a city council to pass an ordinance to: "remove or temporarily suspend from office any person who has been appointed to any municipal office and who after due notice and hearing is adjudged to have been guilty of inefficiency, malfeasance, misfeasance, non-feasance, misconduct in office, or insubordination; and to fill the vacancy caused by such removal or suspension.[6] 990 F. Supp. 396, 398 (D. Md. 1997), *aff'd*, 173 F.3d 423 (4th Cir. 1999) (unpublished opinion). The *Bowers* court held that the statutory language "expressly" limited a city council's authority to pass an ordinance removing an appointed official from their office by requiring the council to provide notice and a hearing, thereby creating a property interest under state law that prevents a commission from suspending or terminating an appointed officer for the misconduct described in § 5-206 without notice and hearing. *Id.* While the statutory language is slightly different because it limits the city council's ability to pass an *ordinance* removing an officer, the *Bowers* court nonetheless found that statutory language requiring a local

[6] The *Bowers* court interpreted similar statutory language previously codified at Ann. Code. Md. Art. 23A § 2(b)(25), which was re-organized into § 5-206.

legislative body to provide notice and a hearing before removing officers for cause created a cognizable property interest. *Id.*

Unlike § 5-206, the plain language of § 27 only applies to removals, not suspensions, of officers, and *does* require a finding of misconduct and the issuance of a complaint in order to trigger its protections of notice and opportunity to be heard. Insofar as commissioners remove an officer for a finding of misconduct as described in § 27, such termination must be pursuant to a complaint issued in writing followed by notice and a hearing for the officer.

The question, then, is whether the alleged facts regarding either the suspensions or terminations, taken as true, implicate plaintiffs' interest under § 5-206 in not being suspended or terminated for cause without notice and hearing or under § 27 in not being terminated pursuant to a complaint and finding of misconduct without notice and opportunity to be heard.

*ii. Deprivation of Interest*

The core disagreement between the parties appears to be the basis on which the commissioners suspended and terminated the RPD employees, and consequently, whether some combination of the defendants deprived Plaintiffs of their rights by suspending and terminating Plaintiffs. The Court considers the alleged facts relative to both the suspensions and terminations.

(1) The Suspensions

The complaint alleges that the commissioners suspended the RPD employees after receiving knowledge of the OSP investigation and the sheriff's application for a search warrant to search the RPD office. ECF 1, at 8 ¶¶ 36–38; ECF 1-9, at 1. In the commission's own words, it was "[p]ursuant to those actions" of the OSP and the sheriff's office that the commission suspended the RPD with pay. *Id.* Consequently, Plaintiffs argue, the suspensions and subsequent terminations triggered § 5-206, which requires pre-suspension notice and hearing when a

municipality suspends an officer for malfeasance or misconduct in office, and § 27, which requires a complaint in writing plus notice and hearing in order to remove an officer for misconduct. ECF 20, at 19.

Town Defendants admit that the that the commission's disbanding of the RPD resulted from the commissioners learning that the entire RPD was the subject of the OSP investigation, but argue that the "temporary suspension was not based on findings of individual misconduct and does not fall within § 27 or § 5-206." ECF 6-1, at 16. However, as discussed above, the plain language of § 5-206 does not require a *finding* of individual misconduct. Ultimately, the facts alleged in the complaint and Town Defendants' own admission supports the proposition that the Ridgely commission suspended each RPD employee *because* of the OSP investigation, which was rooted in allegations of perjury and misconduct in office, and did so without providing the notice and hearing required by § 5-206. *See* ECF 1-9, at 1. Plaintiffs have thus pled sufficient facts that they were deprived of their interest.

In *Bowers*, a police chief sued a Maryland town under § 2(b)(25), the predecessor statute to § 5-206, after being terminated by the town's mayor. 990 F. Supp. at 398. While, as discussed above, the district court held that the council's power to pass an ordinance removing an official was limited by the statutory language, the court nonetheless granted summary judgment, finding that the mayor had independent power under the town charter to appoint and remove officers through a clause stating that all officers "shall serve at the pleasure of the mayor." *Id.* at 398–99. Of note, Defendants identify no such language in the Town Charter.[7] Town Charter § 23 permits

[7] Sheriff Defendants note in reply that "Maryland law permits the emergency suspension with pay of law enforcement officers under investigation." Md. Pub. Safety § 3-107. However, the statutory language permits a *police chief* to enact such suspensions, rather than a legislative body. *Id.* Even still, this provision is addressed in the following analysis regarding whether Plaintiffs were denied due process in their suspensions. *See infra*, at A(iii).

the commissioners to "appoint as many police officers as they desire" and § 26 authorizes the commissioners to appoint any officers or employees of the town as deemed necessary, but neither section governs suspension. ECF 1, at 14 ¶ 57; ECF 6-1, at 16. Similarly, Chief Eckrich's contract contains requirements related to termination, but not suspension, so the commission could not have exercised any independent authority as found in the contract as in *Bowers*. *See* ECF 1-1.

(2) The Terminations

Plaintiffs also argue that their post-suspension terminations on May 1, 2024, violated § 5-206 and § 27 because they were not provided "notice of what charges had been made against them" and they received no "opportunity for a hearing to determine whether cause existed for their . . . termination." ECF 1, at 14 ¶ 59. In opposition, Town Defendants argue that the termination was "a legislative and budgetary act—precisely the type of policy decision that does not create an individual entitlement to continued employment." ECF 6-1, at 16.

Here, the facts alleged, taken as true, do not support the alleged deprivation of Plaintiffs' identified property interest. Unlike the circumstances of the suspensions, where Plaintiffs adequately alleged that the suspensions were due to misconduct, the complaint and its exhibits reflect that the termination of the employees was rooted in budgetary and administrative decision making. Indeed, even a tenured civil servant is not entitled to notice and hearing when their "job is eliminated because of legitimate governmental reorganization or budgetary cutbacks," so long as "the elimination of an employee's position is carried out in good faith and for legitimate budgetary or other reasons." *Christian v. Cecil Co., Md.,* 817 F. Supp. 1279, 1284 (D. Md. 1993).

The termination letters provided to the RPD employees, attached to the complaint, state that the commissioners "have decided to lay off the entire Ridgely Police Department, effective July 1, 2024, as the Town's law enforcement services are being provided by the Sheriff.

Accordingly, [their] employment will end as of June 30, 2024." *See, e.g.*, ECF 1-5 at 1. Plaintiffs fault Defendants for not including an explanation "of what each employee was suspected of having done wrong nor any indication of the employee's right to a pretermination hearing." ECF 1, at 11. But it is not clear why the commission should have done so, given that the commission provided the employees with a reason for their termination detached from the alleged wrongdoing: the commissioners dissolved RPD and terminated the employees because Ridgely had contracted with the Caroline County Sheriff's Office. ECF 1-5, at 1. Consequently, while Defendants' initial alleged due process violation of suspending Plaintiffs for misconduct without notice and hearing may have sparked the events giving rise to their eventual termination, the complaint's exhibits show that at the time the commission terminated RPD employees, the commission had a valid reason to do so rooted in policy and administrative considerations.

The commission's power to terminate the police department is further grounded in Town Charter § 23, which permits the commissioners to "appoint as many police officers as they desire," and § 26, which authorizes the commissioners to appoint any officers or employees of the town as deemed necessary. ECF 6-1, at 16. And as the complaint notes, Plaintiffs "were appointed to their public offices . . . *pursuant to* Sections 23 and 26 of the Town's Charter." ECF 1, at 14 ¶ 57 (emphasis added). Because the complaint and its exhibits effectively allege that the commissioners laid off the RPD due to the new contract with the sheriff's office, and the Town Charter gave Defendants the authority to determine the appropriate number of police officers, Plaintiffs have not adequately pled facts to trigger the protections of either § 5-206 or § 27 relative to their terminations.

*iii. Without Due Process of Law*

Because plaintiffs have adequately pled facts alleging that they were deprived of a property interest relative to their suspensions, the final question is whether the deprivation occurred without due process of law—that is, "the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

"An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). At the same time, "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey*, 408 U.S. at 481. The Supreme Court has identified three factors for consideration: (1) the private interest that will be affected by the official action; (2) the risk of erroneous deprivation of such interest through the procedures used and the probable value of additional procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional procedural requirement would entail. *Mathews v. Elridge*, 424 U.S. 319, 335 (1976).

The violation of a "state-created rule regulating the deprivation of a property interest" does not necessarily violate the Due Process Clause given the "well recognized need for flexibility in the application of due process doctrine." *Riccio v. Cnty. of Fairfax, Va.*, 907 F.2d 1459, 1469 (4th Cir. 1990) (citing *Mathews*, 424 U.S. at 335). Ultimately, "[a]lleged violations of due process in the deprivation of a protectable interest are to be measured against a federal standard of what process is due and that standard is not defined by state-created procedures, even when those state-created procedures exceed the amount of process otherwise guaranteed by the Constitution." *Id.*

"Under the federal standard of what process is due, [a] plaintiff's suspension with pay [does] not violate the Fourteenth Amendment, even if it was a suspension . . . for punitive reasons." *Mansoor v. Cnty. of Albemarle*, 124 F. Supp. 2d 367, 380 (W.D. Va. 2000) (internal quotations and ellipses omitted) (dismissing Fourteenth Amendment due process claim for officer who was suspended with pay following psychologist's report that plaintiff had impaired judgment and holding that "because the plaintiff's suspension was 'with pay,' instead of without pay, he could not have been deprived of federal due process"); *cf. Royster v. Bd. of Trs. of Anderson Cnty. Sch. Dist. No. Five*, 774 F.2d 618, 621 (4th Cir. 1985) (holding any "constitutionally protected property interested" an employee has from an employment contract is "satisfied by payment of the full compensation due under the contract"); *see also Fields v. Durham*, 909 F.2d 94, 98 (4th Cir. 1990) ("[T]he property interest is more generally in continued employment, and no deprivation exists so long as the employee receives payment of the full compensation due under the contract." (internal quotation omitted)). Similarly, the Supreme Court has held that "in those situations where the employer perceives a significant hazard in keeping the employee on the job, it can avoid the [due process] problem by suspending with pay." *Loudermill*, 470 U.S. at 545–45.

Additionally, Maryland law itself supports immediate suspension of an officer with *or* without pay—albeit, through statutory language granting a police chief, rather than a local commission, authority to, "[p]ending an investigatory, administrative charging committee, and trial board process, . . . impose an emergency suspension with or without pay if the chief determines that such a suspension is in the best interest of the public." Md. Pub. Safety § 3-107.

Because the complaint alleges that the RPD employees were suspended *with pay* given the pending OSP investigation, ECF 1, at 8 ¶¶ 38–39; ECF 20, at 19, the alleged facts taken as true do not support a claim that Defendants deprived Plaintiffs of their property interest without due

process of law by suspending them with pay but without notice or a hearing. Consequently, it is unnecessary to reach Sheriff Defendants' arguments regarding whether they are amenable to suit on this count. *See* ECF 16-1, at 9–12. Count I is accordingly dismissed.

**2. Substantive Due Process (Count II)**

"Substantive due process is a substantially narrower concept than procedural due process, for it serves as 'an absolute check on certain governmental actions *notwithstanding* the fairness of the procedures' used to implement those actions." *Front Royal & Warren Cnty. Indus. Park Corp. v. Town of Front Royal*, 135 F.3d 275, 287–99 (4th Cir. 1998) (quoting *Love v. Pepersack*, 47 F.3d 120, 122 (4th Cir.), *cert. denied,* 516 U.S. 813 (1995)) (emphasis in *Front Royal*). "The touchstone of due process is protection of the individual against arbitrary action of government." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998). "'Arbitrary action,' however, is used in a constitutional sense, which encompasses 'only the most egregious official conduct,' namely that which 'shocks the conscience.'" *Slaughter v. Mayor & City Council of Baltimore*, 682 F.3d 317, 321 (4th Cir. 2012) (quoting *Lewis*, 523 U.S. at 846). "Defining conduct that shocks the conscience . . . refers, as a constitutional construct of substantive due process, to 'conduct intended to injure in some way unjustifiable by any government interest.'" *Slaughter*, 682 F.3d at 321 (quoting *Lewis*, 523 U.S. at 849).

Plaintiffs argue that Defendants' actions rise to the level of a substantive due process violation because they were

> intended to overthrow and destroy the [RPD], and the means to accomplish this coup were intentional and outrageous, including falsely asserting various criminal violations to the Caroline County Circuit Court in sealed documents without probable cause to believe crimes had actually been committed; repeating these false claims to State's Attorney Sloan Franklin; claiming falsely and publicly that the suspension and termination of the plaintiffs was directed by the Office of the State Prosecutor, and acting to suspend and terminate the plaintiffs before any investigation was completed and without due process of law as set forth in Count I.

ECF 1, at 16 ¶ 64. Further, Plaintiffs allege, the actions of Sheriff Baker, Deputy Helmer, commissioners Hurley and Buckle, operations director Christ, clerk-treasurer Berkey, and James Joles were "motivated by hatred of the RPD and/or greed, and each of these defendants displayed actual malice toward the plaintiffs intending to harm the plaintiffs both in their property and reputation." *Id.* ¶ 65. Plaintiffs appear to group both the suspensions and terminations into their substantive due process claims. *Id.* ¶¶ 64–65.

While Plaintiffs recite the requirements of a substantive due process violation in Counts II and VI—that Defendants intended to injure Plaintiffs and were motivated by hatred of the RPD—the remainder of complaint does not support Plaintiffs' allegations. According to the complaint itself, the commission suspended the RPD employees because of the open OSP investigation, ECF 1, at 9 ¶ 39, but later dissolved the RPD because at that point, the town had contracted with the sheriff's office, ECF 1, at 11 ¶ 46. The full complaint and exhibits' allegations, taken as true, thus do not support executive action that is "unjustifiable by *any* government interest," *Lewis*, 523 U.S. at 849 (emphasis added), because the complaint identifies at least two interests to justify Defendants' actions: an open OSP investigation and the existence of another law enforcement services contract. ECF 1, at 9 ¶ 39; ECF 1, at 11 ¶ 46. Though Plaintiffs allege that the original source of these actions and determinations was Joles' and Sheriff Baker's collusion to hatch a coup, ECF 1, at 7 ¶¶ 30–32, this is not enough to defeat the governmental interests that the complaint itself identifies in suspending the RPD employees and later dissolving the department. For example, Plaintiffs allege that Sheriff Baker reported false allegations to Caroline County State's Attorney Sloan Franklin, who in turn referred the allegations to the OSP that resulted in the opening of an investigation. ECF 1, at 7 ¶ 33. But Plaintiffs never allege that Franklin knew the allegations were false, or more importantly, *how* Franklin knew they were false. *Id.* Similarly,

Plaintiffs allege that Baker repeated the false allegations to the commissioners and town employees on March 11, 2024, but never allege in a non-conclusory fashion that the commissioners or town staff knew that the allegations were false. *Id.* at 8 ¶¶ 35–36. Consequently, as the complaint tells it, though Joles' and Baker's false allegations sparked the series of events leading to the suspensions and terminations, the key decision makers never knew those allegations were false in the first place.

Plaintiffs further argue that the commissioners acted arbitrarily because the (false) allegations of criminal misconduct they received during two meetings on March 11, 2024, "related to only Chief Eckrich; however, the defendants used the allegations against Chief Eckrich to arbitrarily and intentionally suspend *all* RPD employees." ECF 20, at 23 (emphasis in original); *see also* ECF 1, at 7–8 ¶¶ 32–36. But the complaint's exhibits contradict this argument, as the OSP investigation attached to the complaint states that the commissioners had been presented with "a document outlining allegations of misconduct and improprieties associated with Eckrich *and members of the RPD.*" ECF 1-8, at 3 (emphasis added and capitalization altered). "[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached [to the complaint,] . . . the exhibit prevails." *So. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013) (*quoting Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir.1991)) (brackets in *So. Walk*). Consequently, Plaintiffs have not sufficiently pled that commissioners inappropriately used allegations against *just* Chief Eckrich to suspend all RPD employees.

Because Plaintiffs have not pled facts that plausibly give rise to a substantive due process claim, Count II is dismissed.

### 3. Defamation Plus/Stigma Plus (Count III)

"The Supreme Court has acknowledged a constitutional liberty interest in one's reputation." *Elhady v. Kable*, 993 F.3d 208, 225 (4th Cir. 2021) (citing *Kerry v. Din*, 576 U.S. 86, 91–92 (2015)). When "reputational injury is accompanied by a state action that distinctly altered or extinguished the plaintiff's legal status, such as termination of public employment, a due process claim arises." *Murphy-Taylor*, 968 F. Supp. 2d at 731 (quoting *Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 315 (4th Cir. 2012)) (internal quotation marks and brackets omitted). "To state this type of liberty interest claim under the Due Process Clause, a plaintiff must allege that the charges against him: (1) placed a stigma on his reputation; (2) were made public by the employer; (3) were made in conjunction with his termination or demotion; and (4) were false." *Sciolino v. City of Newport News, Va.*, 480 F.3d 642, 646 (4th Cir. 2007).

In their complaint, Plaintiffs allege that on

> several occasions, including on May 6, 2024 and May 13, 2024,[8] the defendants published new[s] releases announcing that the plaintiffs had been "suspended" "pending an investigation by the [OSP]." The OSP's website indicates they investigate "misconduct in office by public officials or employees" and other serious felony offenses. These public statements, combined with their immediate suspension communicated that the plaintiffs were under investigation for misconduct in office, including serious criminal misconduct and therefore constitute defamation *per se* because falsely accusing the plaintiffs of committing crimes is defamatory on its face.

ECF 1, at 17 ¶ 68. Further, Plaintiffs allege they lost their jobs "purportedly as a direct result of the criminal investigation by the OSP, first through suspension and then through termination," *id.* at 18 ¶ 70, and that that the widespread dissemination of these statements "immediately caused severe harm to the plaintiffs' reputations and standing in the community," *id.* at 17 ¶ 69.

---

[8] This appears to be a typo in Plaintiffs' complaint. The complaint only alleges three press releases by the commission, on March 13, 2024, May 6, 2024, and September 9, 2024. ECF 1-2; ECF 1-7; ECF 1-9. The phrase "May 13, 2024" does not appear anywhere else in the complaint other than this paragraph. *See* ECF 1.

As to the second and third elements, it is clear that the commission made the statements publicly through press releases, and that the statements were connected to both the suspension and ultimate termination of the RPD employees. *See* ECF 1-7; ECF 1-9.

However, even assuming arguendo that the commission's press releases placed a stigma on Plaintiffs' reputations, the complaint demonstrates that the commission's statements were not false—thus defeating Plaintiffs' claim. The public statements in question "announc[ed] the plaintiffs had been suspended because they were under investigation by the [OSP], which is charged with prosecuting case[s] of misconduct in office by public officials or employees and other serious offenses." ECF 20, at 26. "These public statements combined with their immediate suspension and ultimate termination communicated that the plaintiffs were under investigation for and likely committed criminal misconduct in office." *Id.* at 27. According to Plaintiffs, these statements are false for two reasons: first, "because none of the plaintiffs, other than Chief Eckrich, were the subject of any criminal investigation." ECF 20, at 27. And second, "because they implied plaintiffs had engaged in criminal misconduct while in office—a completely false allegation as to all plaintiffs." *Id.*

But the complaint does not support—and in fact contradicts—the proposition that the statements were false. First, neither the March 13, 2024, release ("March Release") nor the May 6, 2024, release ("May Release") states that each plaintiff was under investigation, as Plaintiffs suggest. *See* ECF 20, at 26. Instead, the March Release states that the commissioners "suspended with pay the entirety of the [RPD], effective immediately, pending investigation by the [OSP]." ECF 1-2. Similarly, the May Release states that the commission had "suspend[ed] the Ridgely Police Department pending an investigation by the [OSP]." ECF 1-7. Neither release mentions individual plaintiffs nor suggests that individual plaintiffs are under investigation for particular

wrongdoing. *Id.* Both merely state that the entire department was suspended pending an OSP investigation. *Id.* Second, however, even if the release did suggest that each RPD employee was under investigation, it is not clear that this would be a false statement either, as the OSP report released by the town states that the commissioners had received a document "outlining allegations of misconduct and improprieties associated with Eckrich *and members of the RPD.*" ECF 1-8, at 3 (emphasis added and capitalization altered); *see also* ECF 1, at 19 ¶ 75(a–b) ("James Joles met with Sheriff Baker and falsely accused Chief Jeffrey Ekcrich *and other members of the RPD* of serious criminal misconduct," and then Sheriff Baker "knowingly reported the unfounded allegations to Caroline County State's Attorney Sloan Franklin." (emphasis added)). In other words, according to the complaint and attached exhibits, the commission accurately stated that the RPD as a whole had been suspended pending an OSP investigation.

The complaint similarly does not plausibly allege that the September 9, 2024, release ("September Release") was false. The September Release states that OSP "initiated an investigation into the [RPD]" on February 23, 2024, that was related to the suspected violations of perjury and misconduct in office. ECF 1-9. The release describes OSP's investigatory duties under state law, and attaches a copy of OSP's report, *id.*, which states that OSP's findings "did not disclose or surface sufficient evidence of criminal activity warranting further investigation or prosecution." ECF 1-8, at 7. Once again, to the extent that Plaintiffs argue that characterizing OSP's investigation as relating to the entire department, as opposed to just Chief Eckrich, is false and defamatory, the OSP report itself notes that allegations were received regarding Eckrich *and* other RPD employees. *Id.* at 3. The OSP report also states that the investigation was opened "pertaining to Police Chief Jeffrey Eckrich, Ridgely Police Department (RPD)"—further making

the commission's characterization of the investigation as into the RPD reasonable. *Id.* at 2 (capitalization altered).

Because Plaintiffs have not alleged the false statements required for Defamation Plus/Stigma Plus under the Fourteenth Amendment's Due Process Clause, Count III is dismissed.

### B. Civil Conspiracy (Count IV)[9]

"To state a claim for civil conspiracy under 42 U.S.C. § 1983, a plaintiff must allege that defendants 'acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [his] deprivation of a constitutional right." *Williams v. Mitchell*, 122 F.4th 85, 91 (4th Cir. 2024) (quoting *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996)). Because the Court has found, *supra* at III(A), that Plaintiffs have not adequately pled deprivation of a constitutional right, this count fails and will be dismissed.

### C. *Monell* Claim (Count XII)

If "any person acting 'under color of any statute, ordinance, regulation, custom, or usage, of any State' deprives a United States citizen of any constitutional right, he may be liable in a suit for money damages." *Washington v. Balt. Police Dept.*, 457 F. Supp. 3d 520, 532 (D. Md. 2020) (quoting 42 U.S.C. § 1983). In *Monell v. Dept. of Social Srvs.*, 436 U.S. 658, 690 (1978), "the Supreme Court held that municipalities may be liable for a plaintiff's constitutional harms pursuant to § 1983." *Id.* "There are three necessary elements for *Monell* liability: (1) a constitutional harm

[9] Plaintiffs also bring a civil conspiracy claim under Maryland common law. ECF 1, at 24 (Count VIII). However, "[c]ivil conspiracy is not an independent cause of action under Maryland law." *Lilly v. Balt. Police Dept.*, 694 F. Supp. 3d 569, 592 (D. Md. 2023) (quoting *Hejirika v. Md. Div. of Corr.*, 264 F. Supp. 2d 341, 346–47 (D. Md. 2003)). Instead, "a 'defendant's liability for civil conspiracy depends entirely on its liability for a substantive tort.'" *Id.* (quoting *Fare Deals, Ltd. v. World Choice Travel.Com, Inc.*, 180 F. Supp. 2d 678, 692 (D. Md. 2001)). Regardless, since the Court ultimately dismisses all federal claims, it declines to exercise supplemental jurisdiction over the state civil conspiracy claim.

(2) that stems from the actions of a municipal employee that was (3) taken in furtherance of a municipal policy or custom. *Id.* (citing *Milligan v. City of Newport News*, 743 F.2d 226, 229 (4th Cir. 1984)).

Because the Court has found that Plaintiffs have not adequately alleged a constitutional violation, their *Monell* claim necessarily fails on the first element. Accordingly, Count XII is dismissed.

**D. Remaining State Law Claims**

All remaining claims arise under the Maryland Constitution and Maryland state law, and there is no independent basis for federal jurisdiction. Under 28 U.S.C. § 1367(c)(3), "district courts may decline to exercise supplemental jurisdiction over a claim ... [where] the district court has dismissed all claims over which it has original jurisdiction[.]" "A court has 'wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished.'" *Henderson v. Harmon*, 102 F.4th 242, 251 (4th Cir. 2024) (quoting Shanaghan v. Cahill, 58 F.3d 106, 110 (4th Cir. 1995)). "That said, '[g]enerally, when a district court dismisses all federal claims in the early stages of litigation' . . . 'it should decline to exercise jurisdiction over any remaining pendent state law claims by dismissing those claims without prejudice.'" *Id.* (quoting *Banks v. Gore*, 738 F. App'x 766, 773 (4th Cir. 2018)). Notably, the Supreme Court has stated that while it is not a "mandatory rule to be applied inflexibly in all cases . . . in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie–Mellon University v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

The Court has considered all the relevant factors and concludes that dismissal of the remaining state law claims is appropriate. Aside from the state constitutional questions, this matter presents potentially complicated issues of state law centering on wrongful discharge and tortious interference with contracts. Moreover, though the parties understandably wish their case to proceed with haste, the matter has not entered discovery. Thus, "[t]his case is still in its early stages and the remaining claims present potentially complicated questions of state law" and the state court "is better suited to adjudicate [state law] claims." *Marshall v. Town of Bladensburg*, Civ. No. DKC 24-1549, 2025 WL 822936, at *7–8 (D. Md. Mar. 14, 2025) (declining to exercise supplemental jurisdiction over pendant negligence, gross negligence, and Maryland Declaration of Rights claims after the Court dismissed the Fourth and Fourteenth Amendment and *Monell* claims brought under § 1983 and remanding the case to state court). There are no fairness concerns as all remaining claims can be re-alleged in state court. *See* 28 U.S.C.A. § 1367 (d) (stating that "[t]he period of limitations for any claim asserted under subsection (a) . . . shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period"). Moreover, permitting the state court to address state law claims does not waste judicial resources, nor does it significantly tax the parties who can simply raise their already well-briefed arguments for and against dismissal in state court. In other words, dismissal without prejudice to refile state law claims in state court "would not be inconvenient, unfair, or wasteful of judicial resources." *Henderson*, 102 F.4th at 252.

## IV. CONCLUSION

For the foregoing reasons, Town Defendants' motion to dismiss, ECF 6, is **GRANTED** as to all federal claims and Sheriff Defendants' motion to dismiss, ECF 16, is **GRANTED** as to all federal claims. Pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to exercise supplemental

jurisdiction over Plaintiff's remaining state-law claims (Counts V-XI; Count XIII) and those claims are DISMISSED without prejudice.

A separate implementing order will issue.

Dated: September 25, 2026

/s/
Brendan A. Hurson
United States District Judge